**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 19-cv-01270-CMA-SKC

ALEX W., by and through his parents and next friends, MARLENE W. and
WILLIAM W.,

      Plaintiff,

v.

POUDRE SCHOOL DISTRICT R-1,

      Defendant.

---

**OPINION AND ORDER AFFIRMING AGENCY DECISION**

---

    This matter is before the Court on appeal from a decision of the Colorado

Department of Education ("CDOE" or "Agency"). For the reasons set forth below, the

Agency's decision is affirmed.

## I.    <u>BACKGROUND</u>

**A.    INTRODUCTION**

    This is a special-education case brought under the Individuals with Disabilities

Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1401–19. Plaintiff, Alex W., was a student

in Poudre School District R-1 ("District") from 2014 until 2018. (Doc. # 1, ¶ 1). Alex has

significant disabilities, including Down Syndrome, autism, and hearing and vision

impairments. (Doc. # 23, p. 3). Due to these disabilities, Alex qualifies for "special

education and related services" under the IDEA. 20 U.S.C. § 1400(d)(1)(A).

The IDEA provides federal funds to states to help them educate children with disabilities. *Endrew F. ex. Rel. Joseph F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 993 (2017). In exchange, the recipient states pledge to provide a "free appropriate public education," or "FAPE," to all eligible children. 20 U.S.C. § 1412(a)(1). To ensure that eligible children receive a FAPE, the IDEA requires the local education agency to develop an "individualized education plan," or "IEP" – a comprehensive written plan, prepared by the child's teachers, parents, and other educators, which is designed to ensure that the child's education is "tailored to [his] unique needs." *Board of Educ. v. Rowley*, 458 U.S. 176, 181 (1982). To meet its obligations under the IDEA, a school district must "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

Alex received an IEP for each of the four years he spent in the District. Alex's parents now contend that all of Alex's IEPs fell short of IDEA requirements. Specifically, they argue that (1) the District failed "to assess and appropriately address behaviors that impeded Alex's learning" (Doc. # 23, p. 26); (2) Alex "made minimal educational progress and his functional skills declined" (Doc. # 23, p. 30); (3) the District "failed to evaluate Alex in all areas of suspected disabilities" (Doc. # 23, p. 32); (4) the 2017 IEP improperly reduced the time Alex spent in one-on-one speech-language therapy and occupational therapy (Doc. # 23, p. 34); and (5) the District incorrectly determined that Alex was not eligible for extended school year services (Doc. # 23, p. 36). As a result of these shortcomings, the parents argue, Alex was denied a FAPE during each of his four years in the District. (Doc. # 23, p. 38).

**B.     PROCEDURAL HISTORY**

Alex's parents initially filed a complaint with the Colorado Department of

Education, in accordance with the IDEA's dispute-resolution procedures. *See* 20 U.S.C.

§§ 1415(f)(1)(A), (g). As relief, the parents requested compensatory services as well as

reimbursement of the costs associated with an independent neuropsychological

evaluation. (Administrative Record ("AR") 109-110). The matter proceeded to a five-day

"due process hearing" before an administrative law judge ("ALJ"), where both sides

presented evidence and testimony. (AR 303). At the conclusion of the hearing, the ALJ

determined that Alex had not been denied a FAPE, and he denied the parents' request

for compensatory services. (AR 335). However, the ALJ also found that the District had

improperly refused to pay for an independent neuropsychological evaluation requested

by Alex's parents, and it ordered the District to reimburse the parents for that expense.

(AR 335).

Both parties now appeal the ALJ's ruling. The parents contend that the ALJ

applied the wrong legal standard to their claims and incorrectly concluded that Alex's

IEPs were reasonably calculated to allow him to make appropriate progress. (*See* Docs.

## 23, 29). The District contends that the ALJ erred by ordering the District to reimburse

the parents for the independent neuropsychological examination after the District had

already paid for two other independent examinations. (*See* Doc. # 26).

## II.     <u>STANDARD OF REVIEW</u>

"The IDEA sets up a unique standard for a federal court's review of the

administrative due process hearing." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966,

973 (10th Cir. 2004) (citing 20 U.S.C. § 1415(i)(2)). Specifically, the IDEA requires the district court to engage in a "modified *de novo* review," independently reviewing the evidence in the administrative record and reaching a decision by a preponderance of the evidence. *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995). Though the review is *de novo*, the Supreme Court has held that a district court must give "due weight" to the administrative proceedings and consider the ALJ's factual findings to be "*prima facie* correct." *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). The party challenging the ALJ's decision bears the burden of persuading the Court that the ALJ's decision should be reversed. *Jefferson County School Dist. R-1 v. Elezabeth E. ex rel Roxanne B.*, 798 F. Supp. 2d 1177 (D. Colo. 2011).

### III.   ANALYSIS

**A.   THE PARENTS' APPEAL**

    1.   Preliminary Matters

        a.   *Timeliness of the Parents' Appeal*

Alex's parents challenge each of the four IEPs prepared by Alex's IEP team. The ALJ, however, dismissed the parents' challenge to the 2014 and 2015 IEPs as time barred. (AR 1304-06). A complaint for violations of the IDEA must be filed within two years of the date the parent "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(b)(6)(B); *see also* 34 C.F.R. § 300.507(a)(2). The initial Complaint in this case was filed on July 10, 2018, more than two years after the completion of the 2014 and 2015 IEPs. (AR 1). The ALJ concluded –

and Alex's parents do not dispute – that this Complaint was filed outside the two-year period. Therefore, this Court affirms the Agency's holding in that respect. The challenges to the 2014 and 2015 IEPs are time barred, and the Court will not entertain those challenges. However, the Court will consider the contents of the 2014 and 2015 IEPs as evidence to the extent they are relevant to the other claims and defenses in this case.

### b.   Legal Standards Applied by the ALJ

Alex's parents contend that the ALJ erred by applying the wrong legal standard to their claims (Doc. # 23, p. 23). The Court disagrees.

In *Board of Education v. Rowley*, the Supreme Court held that an IEP satisfied the requirements of the IDEA if it was "reasonably calculated to enable the child to receive educational benefits." 458 U.S. 176, 202 (1982). The Tenth Circuit interpreted this language to mean that "the educational benefit mandated by IDEA must merely be 'more than de minimis.'" *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (quoting *Urban ex rel. Urban v. Jefferson County Sch. Dist. R–1*, 89 F.3d 720, 727 (10th Cir.1996)). In 2017, however, the Supreme Court rejected the Tenth Circuit's interpretation. In *Endrew F. ex. Rel. Joseph F. v. Douglas County School Dist. RE-1*, the Supreme Court clarified that an IEP cannot be said to provide a FAPE unless it is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 1000. The parents now contend that "[t]he ALJ decided this case on [the] 'some educational benefit' standard

that was expressly rejected in *Endrew F.*" (Doc. # 23, p. 24). This contention is incorrect.

The ALJ's order expressly states the correct legal standard: "To meet its obligations under the IDEA, the school district 'must offer an IEP reasonably calculated to make progress appropriate in light of the child's circumstances.'" (OAC 328 (quoting *Endrew F.*, 137 S. Ct. 988)). The parents concede that this is the correct legal standard, (Doc. # 23, pp. 25, 30), and they cite no evidence to suggest that the ALJ disregarded it. Thus, it is plain from the face of the Order that the ALJ was aware of the correct standard and endeavored to apply it.

Alex's parents argue, however, that this Court must reverse the ALJ's decision because the ALJ used the phrase "basic floor of opportunity" to describe the District's obligations. (Doc. # 23, pp. 23-24). "Basic floor of opportunity," they argue, "is synonymous with 'some educational benefit' which equates to 'merely more than *de minimis*' progress – all of which the Supreme Court rejected." (Doc. # 23, p.25). The Court is not convinced.

First, the Supreme Court did not "reject" the notion that schools receiving IDEA funds are required to provide students with a "basic floor of opportunity." To the contrary: the Court has repeatedly reaffirmed that a central purpose of the IDEA is to *establish* a basic floor of opportunity – specifically, the opportunity "to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.C.t 999. Indeed, if there were not some "basic floor" established by the IDEA, the parents would have no basis to challenge the District's conduct.

6

Next, even if the term "basic floor" had been disavowed by the Supreme Court, it does not necessarily follow that the ALJ applied the wrong legal standard. Here, the ALJ specifically explained what he meant by "basic floor of opportunity": the opportunity to "make progress appropriate in light of the child's circumstances." (Doc. 328). In other words, the term "basic floor," as it is used in the ALJ's order does not "equate[] to 'merely more than *de minimis*' progress," as the parents contend. (Doc. # 23, p. 25). Rather, it "equates to" the opportunity "to make appropriate progress in light of the child's circumstances" – the standard set forth in *Endrew F*.

Finally, under the modified *de novo* review standard that this Court must apply to the ALJ's order, the Court does not defer to the ALJ's conclusions regarding applicable legal standard. The Court will therefore evaluate the relevant IEPs to determine whether they were reasonably calculated to enable Alex to make progress in light of his circumstances.

2. <u>Merits</u>

The parents raise five main arguments on appeal. They argue that (1) the District failed to "assess and appropriately address behaviors that impeded Alex's learning" (Doc. # 23, p. 26); (2) "Alex made minimal educational progress and his functional skills declined" during his time in the District; (3) the District "failed to evaluate Alex in all areas of suspected disabilities" (Doc. # 23, p. 32); (4) the 2017 IEP improperly reduced the amount of direct speech and occupational therapy Alex received at school (Doc. # 23, p. 34); and (5) the District "inappropriately determine that Alex was not eligible for extended school year services." (Doc. # 23, p. 36).

        a.    *Failure to assess and address behaviors that impeded Alex's
            learning.*

The IDEA requires that "[t]he IEP Team shall . . . in the case of a child whose

behavior impedes the child's learning or that of others, consider the use of positive

behavioral interventions and supports, and other strategies, to address that behavior."

20 U.S.C. § 1414(d)(3)(B)(i); *see also* 34 C.F.R. § 300.324(a)(2)(i). Alex's parents

contends that that his 2016 and 2017 IEPs "failed to properly assess and address his

behavior problems," and thus denied him a FAPE. (Doc. # 23, p. 26). The Court

disagrees.

        i.     <u>Alex's Initial Placement in the District</u>

The record reflects that the District adequately assessed and addressed

concerns about Alex's behavior. Before Alex enrolled in the District, he was evaluated

for autism by Dr. Samantha Simms Piper, a psychologist at Children's Hospital in

Aurora. (AR 639). Dr. Piper diagnosed Alex with autism and made recommendations for

how best to address that diagnosis. (AR 642). Dr. Piper recommended, among other

things, that Alex's parents "[p]ursue ABA (Applied Behavior Analysis) therapies" for

Alex. (AR 642). Dr. Piper noted that "Approaches based in Applied Behavior Analysis

(ABA) are currently the most widely researched treatment strategies in the field of

Autism," and Dr. Piper advised that "[i]t may be helpful for Alex's caregivers and

teachers to read about Applied Behavior Analysis." (AR 642). However, Dr. Piper did

not prescribe any particular form of ABA therapy, and she advised that "Alex should be

included in a typical classroom as much as possible" to "help him develop more

appropriate social coping skills." (AR 645). "In general," she noted, "children with

developmental delays do better in a fully inclusive classroom rather than isolated in an exclusive environment all of the time." (AR 645).

The District's educational plan for Alex was consistent with Dr. Piper's recommendations. When Alex first enrolled in the District in 2014, his parents considered placing him in the District's autism program at Bacon Elementary School. (AR 305, ¶ 6). However, the autism program did not offer Alex the opportunity to interact with non-disabled peers – which Dr. Piper had recommended (*see* AR 645) – so the District recommended the Integrated Learning Supports ("ILS") program at Werner Elementary School. (AR 305). The ILS program combines special-education and related services – including ABA strategies – with opportunities to interact with non-disabled peers (AR 305, 642). Alex's parents ultimately decided to enroll him in the Werner ILS program. Thus, the record reflects that the District attempted to place Alex in the most appropriate educational setting for his behavioral needs, as identified by Dr. Piper.

The record also shows that the District conducted its own detailed evaluation of Alex to identify his educational and behavioral needs. Upon his enrollment in the District, Alex received a comprehensive initial evaluation that included multiple cognitive assessments, a communicative status assessment, an academic performance assessment, social and emotional status assessments, a health assessment, and a motor abilities assessment. (AR 337-44). The 2014 evaluation also included an "Adaptive Behavior Assessment" designed to measure Alex's social and behavioral skills, as well as a review of the Vineland Adaptive Behavior Scales-2 (VBAS-2) evaluation, which Alex's parents had completed at Children's Hospital. (AR 342). At the

9

due process hearing, the Plaintiffs' own expert witness testified that the VBAS-2 is appropriate for assessing a child's behavioral needs, and that she herself used them in to evaluate Alex's behavior. (AR 1908). Thus, the record reflects that, from Alex's very first days in the District, the District was properly assessing Alex's unique needs, including his need for behavioral supports.

ii.     _The 2014 IEP_

Further, the record demonstrates that Alex's IEP team considered and prescribed appropriate behavioral supports for Alex. In October 2014, Alex's eleven-member IEP team met for the first time to prepare Alex's 2014 IEP. (AR 352). The IEP team consisted of Alex's parents, an education advocate, a special-education teacher, a speech/language specialist, an occupational therapist, a general education teacher, a teacher of the deaf and hard of hearing, a teacher for the visually impaired, a school psychologist, and the assistant principal. (AR 352). The IEP team reviewed Alex's initial evaluation report, (AR 355), and it identified "Social/Emotional Wellness" as an area of need for Alex. (AR 357). The IEP team then set specific, measurable goals and objectives to help Alex develop "socially appropriate behaviors," communication skills, and other interpersonal skills designed to improve Alex's behavior in social interactions. (AR 357; _see also_ AR 354 ("Alex will follow familiar, one-step oral direction"; "Alex will use . . . signs, sign approximations, verbal approximations, or AAC [augmentative communication] device to communicate his wants and needs"); 358 ("Alex will follow [certain] verbal directions")). The 2014 IEP also identified a number of accommodations and modifications to serve Alex's behavioral needs, including "[m]onitoring and

redirection for mouthing behaviors"; "opportunity for safe oral stimulation"; "[r]epetition of instruction"; "[a]llow processing time between presenting task and execution"; "[p]referential seating so Alex is able to see and hear information"; and "direct line of sight by an adult." (AR 360). Significantly, many of the interventions prescribed by the IEP team mirror Dr. Piper's recommendations. (*See* AR 643 ("intervention should target spontaneous communication, social instruction across the day in varied settings . . . play skills, and proactive approaches to behavior problems."). These recommendations reflect an appropriate assessment and attempt to address Alex's behavioral needs in the 2014 IEP. Significantly, Alex's parents cite not evidence that they objected to the behavioral supports in the 2014 IEP.

### iii.     *The 2015 IEP*

In 2015, the IEP team noted that Alex had made progress on each of his goals and objectives from the prior year, and it observed that certain behaviors had improved. Specifically, the team noted that Alex "[s]eems to be more perceptive and attentive now than he was formerly," "[i]s better at visually attending to activities," "[i]s expressing social cues such as kissing mom before requesting a TV show." (AR 377). In light of this progress, the 2015 IEP included a new list of goals (AR 378), as well as an updated list of accommodations and modifications (AR 382). Again, Alex's parents cite no evidence that they expressed any behavior-related concerns with respect to the 2015 IEP.

### iv.     *The 2016 IEP*

Alex's eleven-member IEP team met again on October 3, 2016, to prepare his IEP for the 2016-2017 school year. (AR 398). The 2016 IEP noted that the District

would provide a number of behavior related services, including "a behavior shaping program that emphasizes replacement and shaping of behaviors based on ABA [Applied Behavior Analysis] principals, such as Discrete trial, Errorless Learning and Gentle Teaching techniques, Play and Leisure instruction, as well as Natural Environment Teaching." (AR 411). The 2016 IEP also recognized that Alex needed an opportunity to apply his learned skills in real-life situations and should not be fully isolated from other students: "Alex needs opportunities in the general education environment to practice social skills and social language, as well as appropriate classroom behavior." (AR 413). All of these assessments, observations, and interventions reflect that Alex's 2016 IEP was reasonably calculated to enable him to make progress in all areas of need, including behavior.

>                  *v.*     <u>The 2017 IEP</u>

In September 2017, the District performed a triennial reevaluation of Alex's needs, which included general intelligence assessments, communication assessments, social and emotional assessments, motor assessments, and a hearing and vision screening. (AR 431-32). Unlike the 2014 evaluation, which was conducted before Alex had spent significant time in the District, the 2017 evaluation included detailed input and observations from Alex's teachers. (AR 434). The 2017 evaluation also noted that Alex's "parents are concerned that Alex is 'picking up bad habits from others' and is 'kicking and pulling hair.'" (AR 434). According to the evaluation, Alex's teachers were working to address these behaviors in a variety of ways, including providing Alex with "structured tasks that are based around Applied Behavioral Analysis," encouraging replacement

behaviors, providing close supervision and "refrain[ing] from providing Alex with any negative attention in the occurrence of these behaviors, as negative attention often increases the behavior." (AR 434). Alex was observed to correct inappropriate behaviors "with minimal prompting[.]" (OAC 433).

The 2017 IEP also reflected attention to Alex's behavioral needs. The IEP includes a detailed progress report on the goals set by the 2016 IEP. For example, the IEP notes that Alex had "met" some of his 2016 IEP goals and made "satisfactory" progress on others, giving detailed explanations for each progress rating. (AR 453). The IEP also notes that Alex made "minimal progress" on one of his 2016 IEP goals and explained Alex's shortcomings with respect to that goal. (AR 453). With respect to Alex's behavioral progress specifically, the IEP noted that "Alex has been working hard on using a gestural 'wave' to say 'hi to peers and adults vs. grabbing their arm/hand/body/hair/lanyard but still requires moderate modeling supports" (OAC 454); that "Alex is currently providing an appropriate social greeting/closure with 2 or fewer prompts with 75% accuracy" (OAC 454); and that "Alex follows verbal directions paired with a visual cue for the directions of 'stop,' 'come here,' 'give me,' 'sit down,' 'pick up,' and 'hello/goodbye' with one or fewer prompts." (OAC 455). The IEP noted that "Areas of Concern" were that Alex "need[ed] to decrease grabbing behaviors in order to successfully transition between locations and among activities" and needed to "Develop appropriate social skills (e.g. greetings/closures, respecting personal space/property, getting the attention of others, turn-taking)." (OAC 455). In the "Parent Input" section of the IEP, Alex's parents noted that Alex "can be too repetitive," "can become extremely

13

frustrated if he isn't understood," "prefers to stay in his 'comfort zone,'" "is easily excitable, which can lead to hyperactive behaviors," "will pick up mal-adaptive behaviors that he is exposed to," and "shows his frustration by mal-adaptive behaviors (i.e. turning off the lights/blowing raspberries[)]." (OAC 458). "They would like him to have increased opportunities with typical peers to ensure modeling of appropriate behaviors." (OAC 458). To address these concerns, the IEP includes a number of "Accommodations & Modifications" designed to address Alex's behavior, including "Monitoring and redirection for mouthing behaviors," "opportunity for safe oral sensory stimulation," (OAC 462), "educational support from the Integrated Learning Supports teacher, or from a specially trained paraprofessional implementing supports via direction of the teacher," and "a behavior shaping program that emphasizes replacement and shaping of behaviors based on ABA principals, such as Discrete Trial, Errorless Learning and Gentle Teaching techniques, Play and Leisure instruction, as well as Natural Environment Teaching." (OAC 465). The IEP stated that "[s]upervision will be provided in all school environments, including recess, lunch, transitions, and to support self-help related needs." (OAC 465). The IEP provided, "[t]he rest of Alex's school day will consist of opportunities to practice functional communication, pre-academic and life skills, and building on self-help and self-care skills." (OAC 465). Each of these observations, accommodations, and modifications reflects a thoughtful consideration of Alex's behavioral strengths and weaknesses, as well as the most appropriate behavioral interventions for Alex's unique circumstances.

Significantly, all parties agree that Alex's parents were very involved in their son's education, and the parents participated in each of the four IEP meetings at issue here. Alex's teachers testified that the parents seemed "comfortable speaking up about what they see at home and what they hope for [Alex]," and that they even sent written input to the rest of the IEP team following the 2016 IEP meeting. (AR 2009). Indeed, Alex's parents not only objected to aspects of Alex's 2017 IEP, but also, filed a complaint with the state to ensure that their concerns would be addressed. (AR 1509-11). Despite this close involvement in the development of the IEPs, Alex's parents cite no evidence that they or any other member of the IEP team ever objected to the behavioral strategies outlined in the 2014-2017 IEPs. (AR 397-424).

*vi.*    *The Parents' Counterarguments*

Alex's parents argue, however, that "[i]t is undisputed that the School District never performed an assessment to identify Alex's challenging behaviors[.]" (Doc. # 29, p. 2). This claim is untrue. Immediately after Alex was enrolled in the District, the District performed a comprehensive evaluation of Alex that assessed his skills and needs in a variety of areas, including behavior. (AR 342). The 2014 evaluation included a "milestones assessment" that evaluated Alex's "Social Behavior"; a "Barriers Assessment" that that identified Alex's "Negative Behaviors"; a parent interview; a school-based observation by a special-education teacher; a cognitive assessment; and an "Adaptive Behavior Assessment" that measured Alex's "capacity to carry out independent, daily life skills." (AR 338-43). Additionally, the District reviewed a prior behavior assessment performed by Alex's parents and medical providers at Children's

15

Hospital of Denver, which, according to Alex's 2014 IEP, included "a battery of tests" designed to assess Alex's behavior and "level of daily independent life skills." (AR 342). The District also allowed a Board Certified Behavioral Analyst (BCBA), Katherine Horrell, to observe Alex in school and to discuss behavioral strategies with Alex's teachers. (AR 674-74). Additionally, the District had a school psychologist attend the 2014 and 2017 IEP meetings for the purpose of ensuring that Alex's behavioral needs were adequately addressed in the IEP. (*See* AR 2418-19, 2431). Thus, the parents' claim that the District "never performed" an assessment of Alex's behavior is refuted by the record.

Alex's parents next argue that "the School District never consulted with a behavior specialist." (Doc. # 23, p. 9). This claim is also untrue. The record reflects that the District consulted with Alex's private behavior specialist, Katherine Horrell. In fact, the District invited Ms. Horrell to observe Alex in class, and Ms. Horrell even attended Alex's 2016 IEP meeting. (AR 398). Ms. Horrell stated that she collaborated with Alex's teachers and paraprofessionals, giving them suggestions as to how they could support the work she was doing with Alex outside of school. (AR 675-76; AR 2008). Additionally, as discussed above, Alex's 2014 and 2017 IEP meetings included a school psychologist. The psychologist who attended the 2017 meeting specifically testified that one purpose of her attendance at the meeting was to ensure that Alex's behavioral needs were being met. (*See* AR 2418-19, 2431). Indeed, the parents' own expert witnesses, behavioral analyst Danielle Erickson and neuropsychologist Helena Huckabee, prepared a written report stating "[a]s early as 2013, records indicate that

16

PSD [the District] was consulting with a district BCBA [board-certified behavioral analyst]." (AR 621). Further, in 2018, when the parents requested that the District engage a board-certified behavioral analyst to perform a functional behavioral assessment (FBA) of Alex, the District promptly did so. (AR 485). Thus, the parents' claim that the District never consulted with a behavior specialist is belied by the record.

Alex's parents also claim that the District "never considered the use of positive behavioral interventions and supports" with Alex. (Doc. # 23, p. 27 (internal quotation omitted)). Again, the record belies this claim. Each of Alex's IEPs reflects careful consideration of positive behavioral interventions and supports for Alex. In fact, Alex's IEPs expressly state that Alex's educational program would include a behavior-shaping program that emphasized ABA principles:

> Alex will receive educational support from the Integrated Learning Supports teacher or from a specially trained paraprofessional implementing supports via direction of the teacher. Specific services include a behavior shaping program that emphasizes replacement and shaping of behaviors based on ABA princip[les], such as Discrete Trial, Errorless Learning and Gentle Teaching techniques, as well as Natural Environment Teaching. . . . Supervision will be provided in all school environments, including recess, lunch, transitions, and to support self-help related needs. Alex's time in the general education environment will include an emphasis on inclusion during socially appropriate and engaging times . . . as well as carry through of his therapy activities when appropriate. The rest of Alex's school day will consist of opportunities to practice functional communication, re-academic and life skills, and building on self-help and self-care skills.

> (AR 362).

The record also shows that Alex's teachers incorporated behavioral interventions and supports into Alex's daily routine: Alex's classroom teacher, Ms. Day, testified that she was trained in ABA strategies and that she applied those strategies while working with Alex in the classroom. (AR 1992-2032). At the Due Process hearing in this case, a school psychologist testified that Alex's 2017 IEP "was addressing thoroughly [Alex's] behavioral needs." (AR 2431). This evidence undermines Plaintiff's arguments that the District never even considered the use of behavioral support for Alex.

Alex's parents argue, however, that Alex's IEPs were *per se* inadequate because the District "never performed a functional behavioral assessment [FBA] and it never developed a behavior intervention plan [BIP]."[1] (Doc. # 23, p. 9). This argument is incorrect.

"[T]he presence of any problematic behavior does not automatically require a functional behavior analysis under the law." *D.K. v. Abington Sch. Dist.*, 2010 WL 1223596, *9 (E.D.Pa.2010). Rather, if a behavior impedes a child's learning, the IEP team should "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior [.]" 20 U.S.C. § 1414(d)(3)(B)(i). The fact that those interventions do not include an FBA or a BIP "does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *M.W. ex*

---

[1] The parents also argue that "the School District never consulted with a behavior specialist." This contention is simply wrong: a behavior specialist was present during Alex's IEP meeting and apparently expressed no concerns about the contents of the 2016 IEP.

*rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013). That is precisely what happened in this case.

As discussed above, each of Alex's IEPs identified and implemented strategies to address problem behaviors. Danielle Duncan, the school psychologist who attended Alex's 2017 IEP meeting, testified at the due process hearing that "everybody on the IEP team" – which included Alex's parents – "agreed that [Alex] did not exhibit behavior that required a behavior intervention plan." (AR 2431). Alex's parents cite no evidence to the contrary, and they do not allege that they ever objected to the behavior strategies that were proposed by the IEP team. Further, Ms. Duncan testified that Alex's 2017 IEP "thoroughly" addressed Alex's behavior needs, even without an FBA or a BIP. (AR 2431 ("this IEP was addressing thoroughly his behavioral needs. So he didn't require an additional plan."). Further, as discussed above, when the parents requested an FBA, the District promptly provided one. Therefore, the Court finds that Alex's 2016 and 2017 IEPs included sufficient behavioral analysis, intervention, and support to ensure that Alex made appropriate progress in light of his circumstances.

Alex's parents next argue that the District "failed to provide Alex an educational program that would allow him to make behavioral progress" because it failed to "address [Alex's] behavioral problems in a systematic and consistent way." (Doc. # 23, pp. 28-29 (internal quotation omitted)). Specifically, the parents argue that "[n]one of Alex's IEPs contained goals related to improving behavior and no behavior plan was ever considered or developed to manage and reduce these behaviors." (Doc. # 23, p. 29). Again, the Court disagrees.

Each of Alex's IEPs set forth a detailed list of goals and measurable objectives for Alex at the start of each school year. Though the IEPs generally did not distinguish behavioral goals from other academic and pre-academic goals, they did establish a systematic approach to Alex's educational needs – including Alex's behavioral needs. Alex's IEP goals focused on skills like listening, communication, and social skills to help Alex communicate his needs and desires in a behaviorally appropriate way. The IEPs also recognized that Alex needed certain specific accommodations to ensure that he could "[a]ccess the general curriculum and/or appropriate activities to make effective progress," including "[m]onitoring and redirection for mouthing behaviors," "opportunity for safe oral sensory stimulation," and "[m]ulti-sensory materials to address learning and literacy modes." (*See, e.g.* AR 411). The Court finds that the goals and objectives in Alex's IEPs were designed to address Alex's behavioral needs in a systematic and continuous way.

The parents' appeal is essentially asking the Court to second-guess the reasoned judgment of Alex's IEP team. The Court is not permitted to do so. Courts are not "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F.*, 137 S. Ct. at 1001 (internal quotation omitted). In this case, the record reflects that the District provided Alex with an IDEA-compliant IEP each year he spent in the district, and that Alex's his IEPs were reasonably calculated to help him make appropriate behavioral progress in light of his circumstances.

      *b.*    *Failure to make appropriate progress*

Alex's parents next contend that Alex was denied a FAPE because "from 2014 to 2018, Alex made minimal educational progress and his functional skills declined." (Doc. # 23, p. 30). The Court disagrees.

To meet its obligations under the IDEA, a school district must "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. For a child who is "fully integrated into the regular classroom," this standard typically requires that the IEP "be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F. by & through Joseph F. v. Douglas Cnty. Sch. Dist. RE 1*, 290 F. Supp. 3d 1175, 1181 (D. Colo. 2018). As to a child who is not fully integrated in the regular classroom and not able to achieve on grade level, the educational program must be "appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Endrew F.*, 137 S. Ct. 1000. "The goals may differ, but every child should have the chance to meet challenging objectives." *Id.*

The record demonstrates that Alex's IEPs were reasonably calculated to enable him to make progress appropriate in light of his circumstances. For each year he was in the District, Alex's IEPs included a detailed set of goals and measurable objectives that were agreed upon by all parties. When Alex's parents felt that aspects of the IEP were incorrect or inappropriate, they had the opportunity to – and in fact did – voice those concerns. (*See, e.g.*, AR 423). When Alex's parents requested that Alex's goals be

modified, the District noted that input in the IEP and, where appropriate, modified Alex's goals accordingly. (*See, e.g.*, AR 423 (IEP meeting notes noting parent concerns and outlining how they will be addressed)).

Further, the record shows that Alex did, in fact, make progress on his goals. At the start of each new school year, Alex's IEP team would assess Alex's progress on the previous year's goals. Alex's IEPs demonstrate that he made progress on his goals, and that his goals changed from year to year to reflect the previous year's progress. For example, Alex's 2017 IEP includes detailed notes about his progress toward his 2016 goals and objectives, noting that Alex made "satisfactory" progress on fourteen of eighteen objectives; "met" three objectives; and made "minimal" progress on one objective. (AR 453-55). Alex's ILS teacher also testified that Alex made progress on a variety of goals during his time in the District. (AR 2039).

Next, Alex's parents argue that "[t]he School District's 2017 Evaluation Report confirms Alex's failure to make appropriate progress – on any skill level." (Doc. # 23, p. 31). This is simply not true. Although the 2017 IEP did note that Alex's skill levels in certain areas were "similar to that in which he started here at Poudre School District," (AR 439), they did not suggest that Alex's limited progress was unexpected or inappropriate. The parents' own expert witnesses suggested that limited progress may nevertheless be "appropriate" progress in light of Alex's disabilities: "Alex's highest noted developmental level ever has been comparable to a 20-month-old." (AR 598). Thus, even minimal progress may be appropriate for Alex in light of his developmental challenges.

Given the complexity of Alex's disabilities and needs, the best evidence of Alex's progress in the district appears to be the progress reports provide in his annual IEPs. The 2017 IEP, for example, notes that Alex made "satisfactory" progress on 14 of the 18 goals in his 2016 IEP, "met" three other objectives, and made "minimal progress" on one objective. (AR 453-55). The IEP included detailed explanations about Alex's progress and areas for improvement on each of these goals. This evidence contradicts the parents' claims that Alex made no progress whatsoever during his time in the District.

Alex's parents argue, however, that two expert witnesses, behavioral analyst Danielle Erickson and neuropsychologist Helena Huckabee, believe that "Alex had made minimal progress on his IEP goals, that his functional skills had declined and that several IEP goals were set at a level that actually triggered Alex's behavioral decline." (Doc. # 23, p. 31). The Court finds no basis to overturn the ALJ's conclusion based on Ms. Erickson's or Dr. Huckabee's testimony.

First, neither Ms. Erickson nor Dr. Huckabee is an educator, (AR 1780, 1883), and neither has expertise in all of areas in which Alex received instruction. Alex received specialized instruction in, among other things, communication skills, motor skills, independent living skills, and social skills. (*See, e.g.* OAC 453-63 (2017 IEP outlining past goals, present goals, and areas of need)). The goals were formulated in consultation with a variety of educational specialists, including a school psychologist, a speech therapist, an occupational therapist, and a special-education teacher. (*See, e.g.* AR 349 (listing team members involved in Alex's 2014 evaluation) *and* 352 (listing 2014

IEP team members)). Given Ms. Erickson's and Dr. Huckabee's lack of specific expertise in these areas, their opinions as to the appropriateness of Alex's goals in these areas carry little weight.

Nevertheless, both witnesses made sweeping declarations that Alex's IEP goals "are set far too high" (AR 565) and that Alex "has failed to show any academic progress." (AR 1919). But neither witness explained what goals Alex's IEPs *should have* been, or what appropriate academic progress Alex *should have* made; they offer only conclusory second-guessing of the District's efforts, without suggesting any viable alternatives to the District's plans. Thus, their opinions do not meaningfully challenge the validity of Alex's IEP goals.

Further, although Plaintiffs' counsel refers to these witnesses as "independent experts," (Doc. # 29, p. 6), Ms. Erickson's and Dr. Huckabee's conduct in this case belies their independence. Both witnesses conducted their "independent educational evaluations" after the due process complaint had been filed. (AR 1, 545, 586). Neither witness interviewed Alex's teachers to learn more about his educational progress. (AR 1789, 1975). Rather, both witesses chose to interview only Alex's parents, and their expert reports often cite the parents' disputed allegations as though they were proven facts. (*See, e.g.* AR 545 ("This FBA is being sought due to Alex's maladaptive behaviors, as well as the lack of progress he has made throughout his educational history"); AR 594 ("The family requested that the school consult with a BCBA and incorporate ABA strategies to decrease Alex's maladaptive behaviors; however, ABA services were not provided.")). This conduct suggests a bias in favor of Alex's parents.

Additionally, after performing their "independent educational evaluations," Ms. Erickson and Dr. Huckabee joined forces to prepare a "supplemental report" in February 2019. (AR 619). This supplemental report bears the hallmarks of a made-for-litigation expert report by a retained expert witness: it has no obvious educational purpose; it makes sweeping factual allegations without any record citations; and it is rife with unsupported opinions and legal conclusions. Indeed, the stated purpose of the report is to "describe . . . the failure of Poudre School District (PSD) to provide a Free Appropriate Public Education (FAPE)[.]" (AR 619). This is not the role of an independent educational evaluator. *See, e.g. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60–61 (2005) ("IDEA thus ensures parents access to an expert . . . who can give an independent opinion."); *see also T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) ("The parental right to an IEE is not an end in itself; rather, it serves the purpose of furnishing parents with the independent expertise and information they need to confirm or disagree with an extant, school-district-conducted evaluation."). Thus, the supplemental report undermines the independence of Ms. Erickson and Dr. Huckabee.

Given the substantial evidence that Alex made appropriate progress during his time in the District, the Court finds no basis to overturn the ALJ's ruling in this respect.

c.    *Failure to assess Alex in all areas of suspected disability*

Alex's parents next contend that the District "failed to evaluate Alex in all areas of suspected disabilities[,] which resulted in [in]appropriate IEPs and a denial of a FAPE." (Doc. # 23, p. 32). Specifically, the parents contend that "despite knowing that Alex had

an autism diagnosis the School District never assessed Alex regarding his autism," and that despite knowing that Alex had a "speech and language disability," the District "never performed a SWAAC[2] evaluation or consulted with the School District's (or the State's) SWAAC Team." (Doc. # 23, p. 18). These arguments fail.

Under 20 U.S.C. § 1414(b)(3), "Each local education agency shall ensure that . . . the child is assessed in all areas of suspected disabilities." The Record is clear that the District did so here. When Alex enrolled in the District, his IEP team reviewed detailed medical reports prepared by Alex's doctors at Children's Hospital Colorado, which diagnosed Alex with autism and speech-language difficulties. (AR 435). Thus, the District "ensured" that Alex had received the necessary assessments.

The parents imply, however, that the District was required to conduct its own assessments of Alex's autism and speech-language disabilities, even though Alex had already received thorough assessments by qualified professionals. The parents cite no authority to support this position, and the argument therefore fails as a matter of law. *See Garcia*, 520 F.3d at 1125 (the Court must give "due weight" to ALJ's ruling) *and Jefferson County School Dist. R-1*, 798 F. Supp. at 1177 (it is the parents' burden to persuade the Court that the ALJ's decision should be reversed). However, even if they had provided such authority, this argument would nevertheless fail because the record shows that the District *did* perform such assessments.

---

[2] "SWAAC" stands for Statewide Assistive Technology, Augmentative, and Alternative Communication.

Upon Alex's enrollment in the District, the District performed a thorough disability assessment to determine Alex's eligibility for special education and related services. (AR 431-41). The District's assessment resulted in a detailed report outlining Alex's unique educational needs. (AR 431-41). Alex's IEP team used this assessment, along with other assessments and classroom observations, to prepare an IEP that provided services in each of Alex's areas of disability. (*See, e.g.*, 449-69). In accordance with the IEPs, the District provided Alex with special education and related services specifically targeting Alex's autism and speech-language needs. (S*ee, e.g.*, AR 1990). Thus, this argument fails because the record belies the Parents' claim that Alex was never assessed for autism or for a speech-language disability.

        d.     *Reduction in direct speech-language and occupational therapy*

Alex's parents next contend that the District deprived Alex of a FAPE by reducing the amount of time Alex spent receiving speech-language therapy and occupational therapy in the September 2017 IEP. The Court disagrees.

During the 2016 school year, Alex received 240 minutes per month of "direct" speech-language therapy – therapy delivered in a one-on-one or small-group setting – and 180 minutes per month of direct occupational therapy. (AR 411). In addition to this direct therapy time, Alex received another 15 minutes per month of "indirect" service, in which his speech-language pathologist consulted with his teachers to help them apply speech-language strategies in the classroom beyond Alex's one-on-one therapy time. (AR 411). Likewise, the occupational therapist provided at least 20 minutes per semester of "[i]ndirect occupational therapy support . . . to support carry over by the ILS

staff." (AR 411). In 2017, the District proposed changing this model to focus more on indirect speech-language and occupational therapy, incorporating these therapies into Alex's daily programming. As a result, the 2017 IEP proposed reducing Alex's direct speech-language therapy to 160 minutes per month and reducing his direct occupational therapy to 90 minutes per month. (AR 465). To compensate for this reduction in direct therapy, however, the 2017 IEP increased Alex's indirect speech therapy time from 15 minutes per month to 30 minutes per month and increased his indirect physical therapy from 20 minutes per semester to 30 minutes per month.

Alex's parents requested that the District reconsider its proposal to reduce Alex's direct speech-language and occupational therapy, but the District refused their request. (AR 477). The district explained that the change was meant to help Alex work on occupational-therapy and speech-therapy goals throughout the school day, and that Alex was in fact receiving a net increase in therapy time:

> Although direct services from the OT are reduced, Alex has been receiving such instruction throughout his school day. This is consistent with the data showing that Alex made progress one on one with his OT, but has struggled to generalize the learned skills across environments. Notwithstanding the reduction of direct services on the service grid, Alex receives more OT instruction than before because trained educations provide such OT instruction throughout his day, which will help Alex generalize the skills he learns with his OT. Finally, this reduction in direct services provides an opportunity for Alex to spend more time with his peers in general education.

> (AR 477).

The District provided an identical explanation for the reduction in Alex's direct speech-language therapy time. (AR 477).

Alex's parents now argue that the District's decision deprived Alex of a FAPE because "[n]othing in the 2017 Evaluation Report indicated or warranted the reduction in SLP and OT services hours." (Doc. # 23, p. 34). The Court finds this argument unpersuasive. At the due process hearing, the District's occupational therapist, Jill Savage, explained that the change was intended to help Alex's teachers and paraprofessionals to implement therapy techniques with Alex throughout the day:

> So increasing that consult time allowed a significant amount of more time for me to work with the educational team, paras and teachers alike, to carry out daily what, in essence, we were doing – I was doing with [Alex]. So instead of [Alex] getting therapy one or two times a week in a small setting, now he's getting it daily through other people doing it. So he's generalizing the skill. They're using the skill throughout the entire school day versus an isolated spot with me. So on paper it might look like that is a decrease in services; but, in essence, it's actually an increase because now he's getting this all throughout the week versus just one time in a therapy session.

> (AR 2544).

Further, Ms. Savage testified, Alex would still receive one-on-one therapy, and Ms. Savage would observe Alex's teachers and paraprofessionals to ensure that they were implementing occupational therapy techniques correctly: "With this model, there is still weekly times that I'm working with him one on one. It is also allowed for the para and/or the teacher to observe me working with [Alex] to – for me to observe them working with [Alex] to critique anything that may be needed to be changed." (AR 2544-45).

Similarly, the District's speech therapist testified that the purpose of the transition was to further the goal of helping Alex apply the speech-language skills he was working on with his therapist throughout his day:

> Indirect minutes are those collaboration, consultation, working with the whole team, training them on the device . . . expanding his language, what to do if behaviors occur . . . So it was just a way to spread the wealth, I guess, of what I do and make it accessible for all the paras so that [Alex] had that consistent teaching throughout his natural environment. . . . [T]hat's the goal of all of our kids. We want them to generalize their skills into their natural environments, whether it be school, home, in the community. We want these skills to go beyond a one-on-one therapeutic box, so to speak.

> (AR 2377).

Thus, the District provided ample evidence to support its position that the change in Alex's speech-language and occupational therapy time was reasonably calculated to help Alex make progress.

The parents claim, however, that Alex "requires a minimum of 240 minutes a month of direct speech and language therapy services and 480 minutes a month [of occupational therapy services]." (Doc. # 23, p. 35). But they fail to cite any evidence in the record to support this claim. Although they argue that "Anne Schubert, the Speech Language Pathologist, testified that Alex would benefit from more direct speech services," the cited testimony does not actually support the parents' position. (Doc. # 23, p. 20). Ms. Schubert did not discuss whether Alex should receive more direct speech-language therapy in school; rather, when asked whether she would like to see Alex more in an out-of-school setting, she said yes: "I would recommend that he come in more frequently if – in order to see more continued progress." (AR 1409). When Ms. Schubert offered to provide an opinion about the adequacy of Alex's in-school services – "here at my clinic or at school or both, a combination?" – counsel expressly asked her

to limit her testimony to out-of-school therapy: "At the center. At your center." (AR 1409). Thus, the cited testimony does not support the position the parents are taking in this case, namely, that other classroom activities and indirect therapy should have been sacrificed to allow Alex to have more direct therapy.

Finally, the parents argue that this matter has already been adjudicated by the Colorado Department of Education, whose State Complaints Officer (SCO) found in their favor. "The SCO Decision," they argue, "is an administrative decision on the merits of this particular issue," and should guide this Court's decision. (Doc. # 29, p. 16). This argument fails for at least three reasons.

First, it is not exactly true that the SCO decision addressed "this particular issue." *See* SCO Decision, located at https://www.cde.state.co.us/spedlaw/sc2018-503 (last visited July 15, 2022). The SCO decision addressed a procedural challenge to the IEP process: the parents claimed that the District had made a material decision about Alex's education without the parents' input, in violation of the IDEA's procedural requirements. Here, by contrast, the parents are challenging the substantive adequacy of Alex's speech-language and occupational-therapy programming. (Doc. # 23, pp. 19-20, 34-35; Doc. # 29, pp. 16-18 (no mention of any IDEA procedural protections). Thus, the SCO's decision is not on point, and the parents have not shown that it is relevant to these proceedings.

Next, even if it the SCO decision were relevant, the Court need not consider it because it is not properly before the Court. The ALJ excluded "the findings of the state complaint officer" from the due process hearing as hearsay, (AR 1512), and the parents

have not challenged that decision. Thus, the SCO decision is not part of the administrative record. While a Court reviewing an ALJ's decision in an IDEA case may "hear additional evidence at the request of a party," 20 U.S.C. § 1415(e)(2), Alex's parents have not sought leave to submit additional evidence, as is ordinarily required. *See, e.g. Town of Burlington v. Department of Ed.*, 736 F.2d 733 , 792 (1st Cir. 1984) (requiring motion as a prerequisite for presenting additional witness testimony to the reviewing court). Further, the term "additional evidence" generally means facts that were not available at the due process hearing, like testimony of a witness who was previously unavailable or "evidence concerning relevant events occurring subsequent to the administrative hearing." *Id*. "[T]his clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony," and it is not a backdoor to introduce evidence that was properly excluded from the due process hearing. *Id*. By this definition, the SCO is not "additional evidence" appropriate for the Court's consideration, as it was available at the time of the due process hearing but was properly excluded by the presiding ALJ.

### e.   *Exclusion from extended school year services*

Finally, Alex's parents argue that Alex was denied a FAPE because the School District did not provide him with an extended school year ("ESY"). The Court disagrees.

ESY services are special-education and related services provided to the student "[b]eyond the normal school year." 34 C.F.R. § 300.106(b). A school district must provide ESY services at no cost to the student's family only if it determines that the lack of such services will "jeopardize[ ]" the student's progress. *Johnson ex rel. Johnson v.*

*Indep. Sch. Dist No. 4.*, 921 F.2d 1022, 1028 (10th Cir. 1990). But "the availability of alternative resources" is an appropriate consideration when determining whether to provide ESY services. *See Johnson*, 921 F.2d at 1027.

In this case, Alex's parents specifically told the school that they did not want Alex to participate in ESY. (*See, e.g.* AR 669 ("We would like it noted under the ESY section as discussed in the IEP meeting that it is our choice to not have Alex participate in ESY at the current time.")). Additionally, there is ample evidence in the record that Alex did not experience significant regression over school breaks, and that a lack of ESY services did not jeopardize his progress. (*See, e.g.* AR 470, 669-70).

The parents argue, however, that the District was required to offer Alex ESY services, even though his parents would have refused them. (Doc. # 29, p. 18). This argument is unavailing. "Extended school year services must be provided only if a child's IEP Team determines . . . that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(a)(2). In this case, the IEP team – which included Alex's parents – determined that Alex did not need ESY services. Thus, the District did not violate the IDEA by excluding ESY services from Alex's IEPs.

The parents also argue that there was "an abundance of evidence that Alex experiences significant regression – even over weekends." (Doc. # 23, p. 37). But they fail to cite any such evidence. In fact, there is an abundance of contrary evidence: the record reflects that "Alex does not demonstrate significant regression of learned skills following an extended break," (OAC 420), and that after extended breaks, "Alex regains academic and social skills within 2 weeks." (OAC 420). In fact, in their input to the 2016

IEP, the parents admitted that "Alex's skills have not regressed during school breaks[.]" (OAC 669). This admission undermines the parents' unsupported argument to the contrary.

**B.    THE DISTRICT'S APPEAL**

The District claims that the ALJ erred by ordering the District to reimburse Alex's parents for an independent educational evaluation ("IEE") conducted by Helena Huckabee in August 2018. The Court finds no basis to overturn the ALJ's decision.

An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(3)(i). "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the [District]." 34 C.F.R. § 300.502(b)(1). "A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees." 34 C.F.R. § 300.502(b)(5). However, "[i]f a parent requests an independent educational evaluation at public expense, the [District] must, without unnecessary delay, either—(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) Ensure that an independent educational evaluation is provided at public expense[.]" 34 C.F.R. § 300.502(b)(2).

The ALJ determined that reimbursement was appropriate because the District, when presented with a request for an IEE, "was obligated to [either] comply with the request or file for due process without undue delay." (OAC 332). As the ALJ correctly observed, "[t]he District did neither." (OAC 332). The District cites no authority to

suggest that its course of action – simply refusing to provide the requested IEE – was a permissible option under the relevant regulations. Therefore, under the plain language of the relevant regulations, the District is required to "[e]nsure that [the] independent educational evaluation is provided at public expense." 34 C.F.R. § 300.502(b)(2)(ii). The Court finds no basis to overturn the ALJ's conclusion.

The District suggests that the true reason for Dr. Huckabee's evaluation was to create evidence for a later due process hearing. (*See, e.g.* Doc. # 26, p. 48 n. 15). This may be true, but the IDEA is clear that the District may not unilaterally refuse an IEE on this basis. Rather, a district wishing to challenge an IEE request must "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate." C.F.R. 34 § 300.502(b)(2)(i). The District offers no acceptable reason why it failed to request such a hearing. Therefore, it must reimburse the parents for Dr. Huckabee's IEE. However, the Court notes that, for the reasons explained in Section III.A.ii.b. above, the "Supplemental Report" prepared by Dr. Huckabee and Ms. Erickson (AR 619) cannot be properly considered an IEE, and the parents are not entitled to reimbursement for that portion of Dr. Huckabee's work on this case.

## IV.    CONCLUSION

For the foregoing reasons, the Agency's order is AFFIRMED. The Clerk shall enter final judgment in conformity with this Opinion and Order.

DATED:  July 15, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge